IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03103-MEH

EDWARD J. STIEF III,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

    Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Edward J. Stief III appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have not requested oral argument, and the Court finds it would not materially assist in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **reverses and remands** the Administrative Law Judge's decision and the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying his application for DIB benefits filed on August 22, 2011, claiming disability as of July 8, 2009, with conditions

including back injury, lumbar strain, lumbar disc degeneration, laminectomy, and chronic pain. [AR 166] After the application was initially denied on August 13, 2012 [AR 62-68], an administrative law judge ("ALJ") upon the Plaintiff's September 20, 2012 request [AR 69], scheduled a hearing for July 22, 2013. [AR 89]. Plaintiff appeared at the hearing, represented by counsel, and testified, as did a vocational expert. [AR 27-49] The ALJ issued a written ruling on August 8, 2013, finding Plaintiff was not disabled since August 22, 2011, because considering Plaintiff's age, education, work experience and residual functional capacity ("RFC"), there were jobs existing in significant numbers in the national economy that Plaintiff could perform. [AR 8-21] Plaintiff on August 24, 2013, requested review of the decision. [AR 7] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. [AR 1-6] *See* 20 C.F.R. § 404.981. Plaintiff timely filed his Complaint with this Court seeking review of the Commissioner's final decision. *See* Complaint, docket #1.

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on July 19, 1980; he was 31 years old when he filed his application for DIB benefits on August 25, 2011. [AR 126] Plaintiff has a high school education and reported that he completed two years of college, studying mechanics. [AR 20, 167] He has past relevant work as a construction equipment mechanic, stock clerk, construction worker, tire repairer, and retail assistant manager. [AR 20, 167] He claims he became disabled on July 8, 2009. [AR 126] Plaintiff reported that he was limited in his ability to work because of a back disorder, back surgery, and chronic pain. [AR 168; Opening Brief, docket #12 at 3.]

III.     **Medical Evidence**

Plaintiff injured his back when he jumped off a loading dock at his place of employment and then lifted an 80-pound jack from the back of his van while twisting his back. [AR 222, 397] Shortly after the accident, Plaintiff began treatment with Jeffrey Wunder, M.D., a physiatrist. [AR 244] Dr. Wunder ordered an EMG/nerve conduction study that showed mild right L5 radiculopathy. [AR 242] An August 2009 MRI revealed moderate degenerative disc disease at L4-L5 and L5-S1 and mild levoscoliosis. [AR 244-45] Plaintiff received epidural steroid injections toward the end of 2009 [AR 227], however an MRI in early 2010 showed no significant change from the initial MRI. [AR 248]

In February 2010, on referral from Dr. Wunder, Plaintiff visited Cornerstone Orthopaedics & Sports Medicine for a preoperative evaluation and physical for microdiscectomy decompression L4-L5 and L5-S1. [AR 222] The preoperative notes explain that conservative treatment had failed, including injections and traction. *Id*. Plaintiff underwent surgery on March 10, 2010, with surgeon Bryan Castro, M.D. [AR 218-21] The surgery included a right-sided and left-sided L4-5 decompression with facetectomy, undercutting foaminotomy, and a microdiscectomy. [AR 218] Two months after surgery, an MRI showed recurrent issues with the L4-L5 area of the spine, including disc protrusion and fluid collection in the posterior epidural space in the back. [AR 252-53] In August 2010, Plaintiff presented for reevaluation by Dr. Wunder, who noted Plaintiff's complaints of continued, unresolved pain: "symptoms have now recurred and returned to baseline." [AR 405] Dr. Wunder also noted problems with Plaintiff's foot, but the doctor indicated that manual muscle testing was normal, "i.e. 5/5 in all muscle groups." *Id*. Dr. Wunder increased Plaintiff's

3

medications, including an increase of OxyContin, and wrote: "If the patient did not respond to medications, then I would recommend sending back to see [the surgeon] for reevaluation.  I may recommend this no matter what.  There is an absolute last resort dorsal spinal column stimulator [that] could be an option."  [AR 406]  Plaintiff saw Dr. Wunder again on August 26, 2010, when the doctor noted:

> Patient has had chronic right lower extremity symptoms related to radiculopathy.  He is post L5-S1 laminectomy.  He has significantly improved on the left side following surgery but has had persistent symptoms on the right.  He has had diagnostic response to 2 right L5 transforaminal ESIs but no long-term benefit.  This, in combination with his physical examination does suggest chronic right L5 radiculopathy.

[AR 403]  Dr. Wunder and Dr. Castro, the surgeon, discussed Plaintiff's complete pain relief when the L5 nerve root has been blocked; in light of that, Dr. Castro recommended Dr. Wunder conduct an electrodiagnostic study on Plaintiff, which then occurred on September 9, 2010.  [AR 399, 401]  The results found "very mild L5 radiculitis," "consistent with his response to the L5 selective root blocks in the recent past," causing Dr. Wunder to refer Plaintiff back to Dr. Castro for more evaluation.  [AR 400-02]  Later, Dr. Wunder would indicate that this study "revealed findings consistent with continued right L5 radiculopathy."  [AR 399]  Plaintiff also reported to Dr. Wunder at that appointment that his current medications were "working pretty well for him."  [AR 401]  Dr. Castro saw Plaintiff again September 23, 2010, and noted medication changes.  [AR 225]

Meanwhile, Plaintiff had several appointments with Ron Carbaugh, Psy. D., at Psychological and Pain Management Services.  [AR 305]  Dr. Carbaugh's notes reflect six authorized sessions, but records are not provided for them all.  *Id.*  The third of six sessions took place on September 28,

2010, indicating the medical doctors recommended proceeding with a spinal cord stimulator trial. *Id*. Dr. Carbaugh noted: "Mr. Stief continues to express concern and confusion regarding his ongoing pain, as well as his treatment options." *Id*. The pain doctor also provided Plaintiff with "behavioral strategies for short-term pain management." *Id*.

Dr. Wunder saw patient again October 14, 2010, with Plaintiff reporting no improvement with pain and with Dr. Wunder noting that the surgeon, Dr. Castro, did not believe that further surgery would make this patient better. [AR 399] Dr. Wunder reviewed the options with Plaintiff: "to continue to live with these symptoms and manage through medication" or consider a "dorsal spinal column stimulator trial." *Id*. Dr. Wunder opted to refer Plaintiff to David Wong, M.D., for further consultation and opinion as to whether Plaintiff would benefit from further surgery or should attempt the stimulator. *Id*. Dr. Wong evaluated Plaintiff on November 9, 2010, concluding he was not a good candidate for surgery and that a dorsal column stimulator should reasonably be considered; Dr. Wong saw Plaintiff November 15, 2010, and referred him to a stimulator trial. [AR 257, 392-393] Patient continued to be reevaluated approximately monthly, with medical notes reflecting little change in pain levels and continued suspicion of L4-L5 and L5-S1 issues. [AR 383, 387].

Plaintiff at this time also continued to see John Burris, M.D., of Concentra Medical Centers.[1]

_____

[1]The Court notes that it appears the administrative record does not contain complete medical documentation as Plaintiff's first record of seeing Dr. Burris begins on October 25, 2010, with the following history: "The patient [] returns after a long absence with regard to his low back complaints." [AR 397 (name omitted).] No previous record appears showing notes on other appointments. The Concentra Medical Records appear to involve worker's compensation evaluations as they include the job number associated with the injury. *See*, *e.g.*, AR 397-98. The Concentra records appear to align with Dr. Wunder's records as the doctors periodically

[AR 397]  Regarding the stimulator trial, Dr. Burris noted he was "quite guarded with regard to going down that path," yet he awaited feedback from the other doctors. *Id.* On December 27, 2010, Dr. Burris, who appears to use a template from the previous appointment in regard to Plaintiff's history, again saw Plaintiff and noted: "We are awaiting possible injection and possible trial of spinal cord stimulator under the supervision of Dr. Wunder."  [AR 270]

In January 2011, the insurance company denied the stimulator trial, so Plaintiff received medial branch blocks to try to alleviate pain, but they did not work as hoped.  [AR 376, 381, 383] Dr Wunder noted at that appointment: "The patient did admit there are a lot of stressors ongoing in his life.  He reported that they may lose their vehicles and their home.  He has a young family and is very concerned about the vocational prospects."  [AR 376] Plaintiff again visited Dr. Burris, this time on January 28, 2011, with the medical record indicating: "Patient had nondiagnostic response to facet injections.  We are awaiting possible trial of spinal cord stimulator."  [AR 269] Dr. Wunder continued to press for the stimulator, writing the insurance company on Plaintiff's behalf on February 4, 2011.  *Id.* As part of the insurance company's analysis of the request for the stimulator trial, a physician advisor for the insurance company, Gary Ghiselli, M.D., a specialist in orthopaedic spine surgery, wrote the following assessment:

> In response to the requisition for a spinal cord stimulator trial, I would approve the trial at this point in time.  I think he has persistent radiculitis into his right lower extremity in an L5 pattern[;] it could be addressed with a spinal cord stimulator.  In reviewing [notes], I would agree that facet joint injections have not been trialed.  It would certainly be a reasonable approach to address his lower back pain, which I

refer to one another and discuss the coordination of care and treatment plans.  *See*, *e.g.*, *id.* Additionally, the Court notes the redundant nature of the administrative record.  For example, the identical report from Dr. Burris appears in three places.  *See* AR 271-72, 301-02, 397-98.

> think is a completely different problem than the radicular complaints that he has into
> his right lower extremity. The patient has undergone all conservative treatment up
> to this point in time for his persistent radicular symptoms, as well as psychotropic
> agents, nerve stabilizers and antidepressants for the treatment of his right lower
> extremity pain without significant success.

[AR 300] A temporary stimulator was approved and placed on March 3, 2011, by John Sacha,

M.D., at Colorado Pain and Rehabilitation  [AR 407], however Dr. Sacha removed it on March 8,

2011,  because Plaintiff reported it provided short-term pain but not long-term aid as Plaintiff said

he felt one of the leads "move." [AR 275, 369]. On March 10, 2011, Dr. Wunder again evaluated

Plaintiff, finding back pain "flared up probably because of the recent procedures done" but also

finding a "normal" result regarding "manual muscle testing" and ordering Plaintiff to return in "a

couple weeks." [AR 369] On March 11, 2011, Plaintiff again saw Dr. Burris, who concurred with

Dr. Wunder's assessment:

> We have exhausted conservative care with regard to the patient's rehabilitation. He
> had a nondiagnostic response to facet injections and spinal cord stimulator after
> continued pain following surgical intervention for low back pain. I agree with Dr.
> Wunder and believe we are at an endpoint for his care. I would await the results of
> the functional capacity evaluation and Dr. Wunder's impairment assessment. I will
> tentatively see the patient back in 6 weeks for reevaluation, sooner with any
> problems.

[AR 268] Dr. Wunder saw Plaintiff on March 25, 2011, concluding "I think patient is approaching

maximum medical improvement," but sending him to a functional capacity evaluation and

prescribing him a one-year health club membership in order to do therapy in swimming pool. [AR

365]

Catherine Kent, a physical therapist at Concentra Health Services, completed the functional

capacity evaluation on April 27, 2011, concluding that Plaintiff was "in light-strength range for

7

return to work." [AR 279, 361] Dr. Wunder saw Plaintiff on May 5, 2011, noting Plaintiff had a great deal of increased pain after the evaluation done the week prior. [AR 361] Dr. Wunder wrote as follows:

> My intention today was to place this patient at maximum medical improvement and provide him with an impairment rating. Because of the increase in his symptoms, however, and with increased radicular symptoms and questionable weakness on manual muscle testing, I elected today to proceed with repeat electrodiagnostic studies. His last study was in 09/2010. The study today was, therefore, compared to that study. [] [T]he studies today were significant for chronic changes. There was no evidence of acute radioculopathy. This study was improved compared to the last done in 09/2010. [] At his next recheck visit, the patient will be placed at maximum medical improvement and final impairment determined.

[AR 362 (extraneous information omitted)] Dr. Wunder consulted with Dr. Carbaugh, the psychologist with whom Plaintiff met several times and reported Plaintiff has "psychological impairment related to depression and a high level of anxiety." [AR 261] Dr. Wunder saw Plaintiff on May 19, 2011, recommending Plaintiff finish his appointments with the psychologist and continue his medications for pain. *Id*. Dr. Wunder after that appointment completed an Impairment Rating Evaluation, discussed below. [AR 341]

On June 24, 2011, Plaintiff for the last time saw Dr. Burris, who instructed Plaintiff to continue followup appointments with Dr. Wunder and concluded, "Patient is at maximum improvement and is released from our clinic." [AR 267] Plaintiff returned for visits with Dr. Wunder approximately monthly from July 2011 through December 2011, each time indicating pain issues and problems sleeping; each time Dr. Wunder adapted Plaintiff's medications to attempt to

address the symptoms.  [AR 337, 333, 329, 325, 321[2]]

Dr. Wunder's treatment of Plaintiff then moved into quarterly visits.  [AR 319-20]  At a May 1, 2012 visit, Plaintiff reported he "had been doing somewhat better recently," but Dr. Wunder found "[t]he patient continues to have right lumbosacral tenderness [] with reproduction of radicular symptoms on the right side" even with muscle testing normal.  [AR 421 (extraneous information omitted)]  At appointments in June and October 2012, Plaintiff's condition remained largely unchanged.  [AR 420, 416-17]  Plaintiff also saw Dr. Wunder in January, April, and June 2013, each time reporting pain "remaining about the same," resulting in Dr. Wunder's continued attempts to control the symptoms with medication changes.  [AR 413, 427, 424]  At the June 2013 visit – the end of the medical record provided to the Court – Dr. Wunder recommended a nerve root block to aid with possible S1 nerve root involvement that he opined could be contributing to decreased lumbar range of motion.  [AR 425]

## IV.    Medical Opinion Evidence

Only one significant medical opinion exists in this case, that of Dr. Wunder, Plaintiff's treating physician, who on May 19, 2011, completed a Medical Source Statement of Ability to do Work-Related Activities, noting that Plaintiff's diagnosis was right L5 radiculitis.[3]  [AR 347-56]

---

[2]The Court cites these records in chronological order of the appointments, although the administrative record numbering produced them out of order.

[3]Dr. Wunder appears to have completed a second, nearly identical report at the request of Plaintiff's counsel.  [AR 311-318]  Material to the Court's analysis, discussed below, is that both include no more than 20 minutes at one time of standing, sitting, or walking.  [AR 314, 350]  Dr. Wunder on the later version added an hour to the total activities Plaintiff could undertake – sitting for four hours in a workday, standing for two and walking for three –  for a total of eight.  [AR 314] The Court need not decide which is the correct version as the dispositive issue does

He opined that Plaintiff could lift no more than 10 pounds, and stand, sit, or walk for no more than 20 minutes at one time.  [AR 347-48]  He noted that Plaintiff could sit for a total of two hours in an eight-hour workday, and stand for two hours and/or walk for three hours total during that same timeframe.  *Id*.  He also found Plaintiff could never stoop or climb ladders or scaffolds; he could only occasionally kneel, crouch, crawl, or climb stairs and ramps.  [AR 350]  He also said Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces.  [AR 352]  Finally, he noted Plaintiff's total lumbar range of motion impairment to be 10 percent.  [AR 355-56]

Two other medical opinions also appear in the record.  Dr. Burris's opinion merely limited Plaintiff to lifting no more than 10 pounds.  [AR 260]  Additionally, the physical therapist who handled Plaintiff's functional capacity evaluation, Catherine Kent, opined that Plaintiff could: (1) carry 15 pounds occasionally and eight pounds frequently using two hands, 20 pounds occasionally and ten pounds frequently with one hand; (2) not bend, squat, kneel, or crawl; (3) occasionally use stairs; (4) occasionally sit, stand and walk; (5) frequently forward and overhead reach; (6) use arm controls for light to medium; and (7) do fine hand work.  [AR 281]  In a separate letter, she indicated she thought Plaintiff could perform light work and noted he did not demonstrate symptom exaggeration.  [AR 279]  Dr. Wunder ordered this functional capacity evaluation and considered it in his own treating physician opinion.  [AR 265]

## V.    Hearing Testimony

The ALJ held a hearing on July 22, 2013.  [AR 27-49]  Plaintiff testified that on July 8, 2009, he was injured at work when lifting and turning his back while holding a floor jack used with his

---

not rely on the difference between the one hour left out of the first report.

service van.  [AR 30-31]  He experienced severe pain that he testified did not resolve with physical

therapy, injections, surgeries, an implant to stimulate the area, or pain medication: "[N]one of it has

been any kind of relief – for maybe a couple days on the injections was the best I ever had relief, but

the pain came right back and I'm still in the same boat."  [AR 31]  After the injury, he went back

to work but did only "light duty," working about 20 hours a week instead of his typical 40, until "a

couple of weeks after the injury happened," but he and his boss quickly realized he could no longer

do the job.  [AR 32]  "It got to the point where I was on such a high dose of muscle relaxers that I

couldn't work or I couldn't be around equipment anymore.  I was a liability for the shop.  So I

couldn't even clean, you know, sweep the floors or anything," Plaintiff testified.  *Id*.  Since then, he

has been "stuck at home."  *Id*.

Plaintiff further testified that a wide array of treatments have failed to produce meaningful

relief.  [AR 33-34]  "The only thing that takes the pain away is [lying] down, or the morphine takes

a little bit of the pain away – the edginess of the throbbing and stabbing – the lower back pain."  [AR

34-35]  Plaintiff said he lays down "more than half the day" and experiences throbbing and stabbing

"constantly" in his lower back along with a "tingling numbness" in his foot that causes a burning

sensation "maybe five times a week" that makes him not able to walk.  [AR 35-36]  He said his pain

is "a constant seven" on a one-to-ten scale and noted the foot pain has caused him to fall down the

stairs and twist his ankles.  [AR 36]  He testified he can stand, sit, or walk about 30-45minutes at

a time, "depending on the terrain."  [AR 19, 36, 42]  After that, however, he needs to lie down for

three-to-four hours, after which he gets up and sits in his recliner: "So it's back and forth from the

couch to the [] recliner, but mostly on the couch."  [AR 37 (brand omitted).]  Plaintiff testified he

can lift 10 pounds as long as the item does not need to be lifted from the ground, which he cannot do because it requires bending.  *Id.*

   In addition to pain medications, Plaintiff takes Ativan for anxiety, which began after the back injury.  [AR 37-38]  He said he gets claustrophobic and at its worst, it caused an episode of shaking and nausea that required a visit to the emergency room.  [AR 38]  Generally, he testified he needs to "get away from the situation or crowd" or takes Ativan to control the anxiety.  *Id.*  Regarding chores, Plaintiff struggles with laundry because it involves bending; mopping and vacuuming also are difficult.  [AR 39]  He testified he is not able to play with his children.  *Id.*  He can drive for about 30 minutes before needing to pull over and walk around.

   At the hearing, the ALJ questioned Plaintiff about limitations.  [AR 42-43]  Plaintiff said he can sit or stand for 30-45 minutes, climb 10 stairs without stopping, push and pull with his arms subject to a 10-pound limit, and move his fingers adequately.  *Id.*  The ALJ then examined the vocational expert ("VE").  [AR 43-47]  The ALJ gave the VE the following hypothetical:

> I want you to assume you have a younger individual with a high-school-plus education and the work history you have described.  I want you to assume that he is limited to lifting and carrying 10 pounds occasionally; stand, walk, and sit [stet] for 20 minutes at a time – four hours' total sitting, two hours' total standing, three hours' total walking; occasional use of foot controls; climbing, kneeling, crouching, and crawling; no ladders, scaffolds, or stooping; frequent balance; cannot walk a block at a reasonable pace.  Can you identify any jobs that person could do?

[AR 45]  The VE answered: "No."  *Id.*  The ALJ then asked the VE if he would be able to identify work if a person "could sit for 30-to-45 minutes, stand for 30-to-45 minutes, walk for a half an hour to three-quarters of an hour with the 10-pound lift and other limits," to which the VE answered: "Yes."  [AR 46]  The appropriate jobs would be in the sedentary category, including three jobs in

12

the jewelry industry: "bench hand," "preparer," or "assembler." [AR 46-48] The VE said there are

a total of 251 positions in those three jobs combined in the regional economy where Plaintiff lives

– which includes North Dakota, South Dakota, Nebraska, Montana, Wyoming, and Colorado. [AR

47] The VE indicated that if a person misses more than two days of work per month in those jobs,

he would be terminated; leaving early would also be considered a missed day. [AR 48] In response

to a question from Plaintiff's counsel, the VE noted that if a person needed longer than five minute

breaks each hour or if they needed to lie down, "that would not be acceptable" in those jobs. [AR

48]

The ALJ issued an unfavorable decision on August 8, 2013. [AR 8-26]

## LEGAL STANDARDS

### I.    SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation

process used to determine whether an adult claimant is "disabled" under Title II of the Social

Security Act, which is generally defined as the "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than

12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful

activity. If he is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520. Step Two is a

determination of whether the claimant has a medically severe impairment or combination of

impairments as governed by 20 C.F.R. §§ 404.1520(c). If the claimant is unable to show that her

13

impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See id.* Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See id.* If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed RFC prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion."

*Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ ruled that Plaintiff met the insured status requirements of SSA through March 31, 2015, and had not engaged in substantial gainful activity since July 8, 2009, the alleged onset date. (Step One).  [AR 13]  Further, the ALJ determined the Plaintiff had the following severe impairments: "Lumbar degenerative disc status post L4-[L]5 discectomy and Low Back pain" (Step Two).  [AR 14]  Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three), noting as follows.  [AR 14]

> The claimant has no impairment or combination of impairments that meets or equals the criteria of any of the listed impairments described in Appendix 1 of the Regulations [].  No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment.  The [ALJ] has reviewed all of the evidence and concludes that the claimant's impairments, both singly and in combination, do not meet or equal the severity of any listing.  In reaching this conclusion, the undersigned has also considered the opinion of the Disability Determination Services (DDS) medical consultants who evaluated the issue at the initial level of administrative review process and reached the same conclusion [].   Medical Listing 1.0 covers impairments of the musculoskeletal system.  Regardless of the cause of a musculoskeletal impairment, functional loss for purposes of the listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying

15

> musculoskeletal impairment, or the inability to perform fine and gross movements
> effectively on a sustained basis for any reason, including pain associated with the
> musculoskeletal impairment. The inability to ambulate effectively or the inability
> to perform fine and gross movements effectively must have lasted, or be expected to
> last, for at least 12 months. To ambulate effectively, individuals must be capable of
> sustaining a reasonable walking pace over a sufficient distance to carry out activities
> of daily living. [] The claimant is able to ambulate without any assistive device. He
> is able to perform fine and gross movements effectively. There is no evidence of
> root compression with sensory or reflex loss, or motor loss, no spinal arachnoiditis,
> and no spinal stenosis. The claimant has not met the burden of proof in establishing
> the requirements of listing 1.04.

[AR 14-15 (internal cites and examples of effective ambulation omitted)]

The ALJ then determined that Plaintiff had the RFC to perform "sedentary work as defined in 20 CFR 404.1567(a) with being able to change positions between sitting, standing, or walking every 45 minutes, with no climbing of ladders, ropes, or scaffolds and no stooping, occasional use of foot controls, occasional climbing of ramps or stairs, crouching, kneeling, and crawling, frequently balance [stet], and cannot walk a block at a reasonable pace on rough or uneven surfaces." [AR 15] In discussing this finding, the ALJ provided a recitation of the medical record, describing Plaintiff's doctors' visits and treatments. [AR 15-19] The ALJ concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's
> medically determinable impairments could reasonably be expected to cause the
> alleged symptoms; however, the claimant's statements concerning the intensity,
> persistence and limiting effects of these symptoms are not entirely credible for the
> reasons explained in this decision. [] In sum, the above [RFC] is supported by the
> objective clinical findings. The claimant has alleged debilitating pain that prevents
> him from almost any and all activity. However, he does not have demonstrable
> muscle atrophy or loss of strength. His neurological and sensory examinations have
> been intact. He stated that he lies down most of the day but his records indicate that
> he has gone to a fitness center in the past. He is able to drive a car. The claimant's
> medical records do not supply corroboration for his allegations of disabling pain.
> Parts of his functional capacity evaluation and testing by Dr. Wunder were deemed
> to be inconsistent and therefore invalid. The claimant has asserted that he does not

like to go out but he has not sought any type of therapy or counseling.  No matter what the treating doctors have attempted, the claimant has said that it does not help with the pain.  The claimant has not had any reported subsequent injuries and no medical reason has been given for further deterioration.  None of his treating medical sources has stated that he is not able to work.  The claimant's subjective allegations of pain are not credible.

[AR 19-20]  The ALJ went on to determine that Plaintiff was unable to perform his past relevant work (Step Four), but that considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform the jobs existing in significant numbers in the national economy.  [AR 20]  As a result, the ALJ concluded that Plaintiff was not disabled and, therefore, was not under a disability as defined by the SSA (Step Five).  [AR 21]

Plaintiff sought review of the ALJ's decision by the Appeals Council on August 24, 2013 [AR 7], which was denied [AR 1-6].  Plaintiff timely filed his Complaint in this matter on November 18, 2014.  Complaint, docket #1.

## ANALYSIS

On appeal, Plaintiff asserts the ALJ made three errors: (1) failed to apply the correct legal standard when evaluating the medical evidence; (2) applied the wrong legal standard in determining Plaintiff's medically determinable impairments; and (3) applied the wrong legal standard in failing to find Plaintiff did not meet a listing.  Opening Brief, docket #12 at 1-2.

### A.  ALJ's Evaluation of the Medical Evidence

The ALJ determined that Plaintiff had one severe impairment: lumbar degenerative disc status post L4-5 discectomy and low back pain.  [AR 14]  Yet the ALJ found Plaintiff did not have medically determinable issues and retained the RFC to perform a limited range of sedentary work.

*Id.* Plaintiff argues the ALJ merely described the doctors' records but failed to give controlling

weight – or describe in any way the weight he gave – to Plaintiff's longtime treating physician, Dr.

Wunder.  Opening Brief, docket #12 at 14.

Defendant concedes that the ALJ "did not explicitly assign the weight he given to Dr.

Wunder's assessment," but that "it is clear from the record that the ALJ relied heavily on Dr.

Wunder's opinion, despite what Plaintiff argues."  Response, docket #13 at 10-11.  Defendant

continues:

> Thus, this case is straightforward, as it merely requires the [C]ourt to look at the
> restrictions expressed in Dr. Wunder's assessment and compare it to the ALJ's RFC
> determination. [] [C]ompared side-by-side, Dr. Wunder's assessment and the ALJ's
> RFC assessment are actually quite similar, with one important exception.  Dr.
> Wunder found that Plaintiff needed to change positions between sitting, standing,
> and walking every 20 minutes, while the ALJ found that Plaintiff could change
> positions between sitting, standing, or walking every 45 minutes.  Admittedly, this
> difference is critical because the VE testified that no jobs were available for an
> individual who needed to change positions every 20 minutes. [] In determining
> Plaintiff's RFC, however, the ALJ reasonably relied on Plaintiff's own testimony
> that he could sit up for up to 45 minutes at one time, stand for up to 45 minutes at
> one time, and walk for up to 45 minutes.  [] Thus, to the extent that the ALJ did not
> explicitly discount Dr. Wunder's finding as to the frequency of Plaintiff needing to
> change positions, the ALJ's error was harmless.

*Id*. at 11-12 (internal citations and extraneous information omitted).

According to the "treating physician rule," the Commissioner will generally "give more

weight to medical opinions from treating sources than those from non-treating sources."  *Langley*

*v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2).  In fact, "[a]

treating physician's opinion must be given substantial weight unless good cause is shown to

disregard it."  *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir.

1995).  A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330.  To do so, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [] [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (applying Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2) (internal quotation marks and citations omitted); *accord Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014); *see also* 20 C.F.R. § 404.1527(d)(2).

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the next step, because "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."  *Watkins*, 350 F.3d at 1300; *see also Mays*, 739 F.3d at 574.  At the second step, "the ALJ must make clear how much

weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330. If this is not done, remand is mandatory. *Id.* As SSR 96-2p explains:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§] 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4). Hence, the absence of a condition for controlling weight raises, but does not resolve the second, distinct question of how much weight to give the opinion. *Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while absence of objective testing provided basis for denying controlling weight to treating physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis")). In weighing the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331. In applying these factors, "an ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimatel[y] assign[s] the opinion." *Watkins*, 350 F.3d

at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). Without these findings, remand is required. *Watkins*, 350 F.3d at 1300–01; *accord Krauser*, 638 F.3d at 1330. Finally, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so. *Watkins*, 350 F.3d at 1301.

Here, the Court finds the ALJ did not give "good" reasons – in fact gave no indication at all – as to the weight he gave Plaintiff's treating physician. The opinion provides a long recitation of the medical record, at one point indicating that a study Dr. Wunder conducted was found to be invalid; however, the ALJ does not cite or further explain that assertion and how it affected either the treating physician's opinion or the ALJ's opinion. Further, the ALJ's opinion fails to provide what the Court's independent analysis of the record and lengthy description provided above shows: a team of doctors working together over the course of several years to seek answers to Plaintiff's pain problems that seemingly evaded all treatment. Perhaps, as Defendant asserts, the ALJ relied more heavily on Plaintiff's own testimony; perhaps the ALJ had a valid reason to discount the opinion of Dr. Wunder that Plaintiff could not sit, stand, or walk for more than 20 minutes at a time, which, if true, would leave Plaintiff unable to perform any job in the national economy. But without the ALJ explicitly weighing the medical opinions and explaining why he weighed the facts and medical opinions the way he did, the Court is at a loss as to the ALJ's reasoning – exactly the situation the Tenth Circuit's case law, cited above, seeks to avoid. As such, remand is required for the ALJ to consider Plaintiff's claims in light of a proper weighing of the one significant medical opinion in the case – that of Dr. Wunder – who had an extensive treating relationship with Plaintiff

and led the team of doctors effectuating his care.

Additionally, the Court notes that to the extent the ALJ relied on Plaintiff's own statements at the hearing, the ALJ failed to explain variances in Plaintiff's testimony: in one part of the hearing he said he could handle sitting/standing about 30 minutes at a time, and in other places he said up to 45 minutes at a time.  [AR 19, 36, 45]  Importantly, when Plaintiff said he could stand or walk 30-45 minutes, he said he then "needs to [lay] down for three-to-four hours" [AR 37]  – testimony not mentioned by the ALJ.   The medical record, as discussed above, also at times reflects variance between Plaintiff's opinion of his condition and his treating physician's opinion – a variance not identified by the ALJ.  *See, e.g.*, AR 421 (Dr. Wunder found Plaintiff reported he "had been doing somewhat better recently," but Dr. Wunder found "[t]he patient continues to have right lumbosacral tenderness [] with reproduction of radicular symptoms on the right side" (medication names and dosages omitted)).

As the variance between the time limits is the key fact on which this case turns – 20 minutes (as asserted by Dr. Wunder, which the VE testified would result in no jobs in the national economy), 30 minutes (one of the time limits asserted by Plaintiff in his testimony but not asked of the VE), or 45 minutes (the outer limit Plaintiff testified to but not supported by the medical evidence in the record but which the Plaintiff also said would lead him to need to lay down for "three-to-four hours," testimony ignored by the ALJ) – the ALJ needed to explain his reliance on the latter, which he did not do.

Additionally, the Court notes that the ALJ did not but could have ordered a consultative examination to further develop the record if the ALJ suspected Dr. Wunder's 20-minute limitations

were unreasonably low.  In a social security disability case, the claimant has the burden to prove his

disability.  *Wall v. Astrue*, 561 F.3d 1048, 1063 (10th Cir. 2009).  Yet the Tenth Circuit, in *Hawkins*

*v. Chater*, 113 F.3d 1162 (10th Cir. 1997), has explained that the ALJ has some burden in

developing the record:

> How much evidence must a claimant adduce in order to raise an issue requiring
> further investigation? Our review of the cases and the regulations leads us to
> conclude that the starting place must be the presence of some objective evidence in
> the record suggesting the existence of a condition which could have a material
> impact on the disability decision requiring further investigation. [] Isolated and
> unsupported comments by the claimant are insufficient, by themselves, to raise the
> suspicion of the existence of a nonexertional impairment. [] Specifically, the
> claimant has the burden to make sure there is, in the record, evidence sufficient to
> suggest a reasonable possibility that a severe impairment exists. When the claimant
> has satisfied his or her burden in that regard, it then, and only then, becomes the
> responsibility of the ALJ to order a consultative examination if such an examination
> is necessary or helpful to resolve the issue of impairment.

*Id.* at 1167 (internal citations omitted).  The standard is one of reasonable good judgment on the part

of the ALJ.  *Id.* at 1168.  The duty to develop the record is limited to "fully and fairly develop[ing]

the record as to material issues." *Id.* (citing *Baca v. Dep't. of Health & Human Servs.*, 5 F.3d 476,

479–80 (10th Cir. 1993)).  The ALJ's "starting place must be the presence of some objective

medical evidence in the record suggesting that existence of a condition which could have a material

impact on the disability decision requiring further investigation."  *Howard v. Barnhart*, 379 F.3d

945, 949 (10th Cir. 2004) (citing *Hawkins*, 113 F.3d at 1167).

If Plaintiff's RFC regarding limitations on sitting, standing, and walking required further

investigation, the ALJ should have ordered a consultative examination and then explained in the

opinion the weight given to the treating physician versus the consultative examiner.  If the

limitations did not need further investigation, the ALJ should have explained the weight he gave –

or did not give – to Dr. Wunder's opinion as Plaintiff's treating physician or, at a minimum,

explained why Plaintiff's conflicting testimony should be controlling over the opinion of the treating

physician.  For lack of any track record on the weight given to the medical opinion evidence, the

Court concludes the ALJ erred.

**B.     Remaining Issues**

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require

reversal."  *See Cross v. Colvin*, 25 F. Supp. 3d 1345, 2014 WL 969688, at *2 n.1 (D. Colo. 2014).

The Court expresses no opinion as to the Plaintiff's remaining arguments and neither party should

take the Court's silence as implied approval or disapproval of the arguments.  *See Watkins v.*

*Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by

appellant because they may be affected by the [administrative law judge's] treatment of the case on

remand.").  The Court also does not suggest a result that should be reached on remand; rather, the

Court encourages parties and the ALJ to consider fully and anew the evidence and all issues raised.

*See Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995) ("We do not dictate any result [by

remanding the case]. Our remand simply assures that the correct legal standards are invoked in

reaching a decision based on the facts of the case.") (citations and quotation marks omitted).

## <u>CONCLUSION</u>

In sum, the Court concludes that the ALJ in this case failed to properly articulate the weight

given to the treating physician, which if relied upon would have led to an RFC that resulted in zero

jobs in the national economy.  The Court thus finds the final decision is not supported by substantial

evidence in the record as a whole.  Therefore, the ALJ's decision that Plaintiff Edward J. Stief III

was not disabled is **reversed and remanded** for further review and explanation.

Dated at Denver, Colorado this 8th day of October, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge